Birchard, Judge.
By the deed of John Finley and Fielding M. Bradford, executed on the 29th November, 1815, the complainant became owner, in fee, of the undivided moiety of the three surveys, and of the estate, by courtesy of John Finley, (who is yet alive,) in the other moiety. He also acquired a right of action upon the covenants of that deed.
^Charles Bradford, the warrantee, died prior to the entries in *359 his name, which were made before the year 1807. There is no proof of any fraud in the purchase of F. M. Bradford and John Finley; and if the consideration was not paid in full, (which does not appear, while the legal presumption is, that full payment was made,) it would not avoid the deed, but would only operate as a lien on the land inter parties,
Barr, II. H. Finley and his uncle, went to view the land before they called on Galloway, and found it in the adverse possession of purchasers from him, whose possession was of twenty years’ standing. All the parties then supposed the patent from the United States sufficient to vest a valid, legal title in the patentee and his heirs, and acting upon this assumption, (which has become fact by virtue of the act of Congress of 1836, as explained -in reference to this identical title, in 12 Peters, 269,) they considered the purchasers and occupants, as they were in fact, legal owners of an undivided moiety of the land, each, in his own right, derived from Fielding M. Bradford, and of the life estate of John Finley in the other moiety, with a right to demand compensation of Finley their father, on failure of any part of the title. This was the state of things when the contract of 1835 was entered into, and which should be considered in determining whether the inadequacy of price is so great as to justify the Chancellor in refusing to enforce a specific performance.
Both parties dealt with their eyes open. The respondents were strangers in the State, and may not have been as well informed of the value of the property as complainant, who had been well acquainted with it for many years, and had dealt largely in Virginia Military Lands. But they did not rely upon him for information ; and, if they distrusted the sufficiency of their own, might have acquired knowledge of its value by making suitable inquiries in the neighborhood. They had no right to expect Galloway would volunteer information tending to induce them to increase their demands of him for lands which, twenty years before, he had purchased of their father, at a price considered fair, and which was but a trifle *less than the [359 minimum price of United States’ lands ; more especially, as the only profit of the purchase to Galloway, was the difference between the sum to be paid them, and the sum which his vendees might recover on his covenants of warranty — less the amount of the claim against their father and the estate of Fielding M. Bradford.
This view presents the case in a very different light from that in which it is seen by respondents’ counsel. Indeed, it was hardly fair *360 to treat the actual value of the land in 1835, as the true test in determining the question of adequacy of consideration ; ifirst; Because it was incumbered with a life estate of uncertain duration ; Secondly : It was in the actual possession of other persons, who had claimed it as. owners for twenty years, who had recorded titles, and, if dispossessed by paramount title, had a right, under the act for the relief of occupy’ ing claimants, to demand pay for their improvements ; Thirdly : Such lands are generally sold for a large percentage less than the actual value, fixed upon the suppo.sition that the title is undoubted, on account of the well known difficulty and uncertainty of all titles in the Virginia Military District. Those who best understand this description of titles, and who have dealt largely in them, lose, on an average, not less than one tenth of their purchases, by some defect springing up-which was not anticipated, and which nothing but extreme vigilance eoiild have guarded against; Fourthly: One who buys a tract of twenty eight hundred acres of land for the purpose of reselling it, is not expected to pay the full amount for which it could be retailed in small parcels. On the supposition that there is no known defect in the title, such a sale in the Virginia Military District, for cash payments, is often made for not more than half the actual value of the’ land. The weight of evidence fixes the whole value of this land at about $35,000. But admitting the value in 1835 to be the sum estimated by respondents’ counsel, $50,000, let us try the question of inadequacy of consideration :—
They claimed a moiety of this, which is...................... $25,000'
From which should be deducted the incumbrance of A life estate, equal to seven years’ interest, which is 10,500
*Also the consideration paid John Finley, and five years’ interest thereon.................................... 2,275-
Also the expected profit of a purchaser, who takes the trouble and risk of a resale — say 20 per cent, on the capital invested....................................... 4,000
And we have the gross sum of $16,775, which, deducted from $25,-000, leaves but $8,225, for which complainant gave up his claim to the land lying in Brown county, and agreed to pay $8,000. In this calculation no deduction is made on account of sundry parcels of the land sold for taxes, and which were probably forever lost to the proprietor. The whole land is estimated at the highest price, assuming the title perfect. If respondents’ counsel had taken this view of the facts, would they have stated that “ G-alloway persuaded the defend *361 ants to agree to sell property worth $25,000, for $8,000 ; ” and, on the. strength of the erroneous assertion, put the questions, as if they were unanswerable, “ Is it right ? Was it fair ? Is it honest ? ”
We have endeavored to look at both sides of this case, and must say that, to us, it seems these young men, with the aid of their advisers, did not make so bad a bargain. They evidently appreciated the situation of Galloway. They knew that he had sold the land, years before; had conveyed, with covenants of warranty; and, at all hazards, must protect the purchasers, or respond to them in damages. This is shown by their threats to sell to General Taylor, if he would not give their price. Might it not with some propriety be asked, if they did not take advantage of his situation to drive a good bargain with him ? Under the circumstances it is certainly not unfair, but quite reasonable to presume, that they would have sold to Taylor, or any other person, if they could have made a better trade.
There is another view of the facts quite conclusive upon the respondents. At the January Term, 1838, of the Supreme Court of the United States, the complainant was seeking a recision of this contract, under a belief that the respondents could not make him a good title.. They successfully resisted him, and procured a decree establishing their title and affirming *the contract. The facts show that they [3&1. were at that time in full possession of all the circumstances of imposition, overreaching and fraud, if any there were, and the conclusion is hardly to be escaped that they, with full knowledge of the facts, had formed the determination to abide by the. terms of the contract, and to waive all advantage which, otherwise, they might have taken. We-think their conduct at that time, and before, was such that they ought not now to he allowed such an objection : that, even if there was some evidence of imposition and inadequacy, they should, in equity, bo regarded as having waived all objections, and as electing to affirm the-, contract, with a perfect knowledge of all the facts affecting their rights. The next ground of defence is, that this cause was fairly before the Supreme Court of the United States — was there adjudicated, and the-decision final. But that bill was filed to rescind, not to enforce, the contract. As amended and finally heard, the complainant, it is true, expressed his readiness to comply, and his desire to do so, if the defendants should be adjudged capable of making him a good title. By the terms of the contract he was not then entitled to a conveyance,, and if he had prayed for it, which he did not, the court would not have decreed it. The prayer for general relief can never be regarded. *362 sufficient to justify a decree for any specific or other relief to which the party, by his own showing, is not entitled. It will meet only the case made ; and the case of Galloway v. Finley and others, reported in 12 Peters, 269, was not like this. Besides, a former adjudication is neither plead in bar, nor relied upon in the answer; and, clearly, the allegations of the bill are not such as to render the objection available on demurrer, if the respondents had interposed one.
It remains to be considered whether the conduct of complainant, and the delay of payment, have been such that a court of equity should refuse to interfere in his favor. Soon after the execution of the contract Galloway received from one of defendants’ attorneys a copy of C. Bradford’s will, from which he discovered, for the first time, that the lands were entered and patented in his name, after his death, and 302] that the titles *were void. Twenty years before he had purchased and paid for the same land, $3500. He had sold it to others, and was bound to protect their titles. To a moiety of the land, and to a life -estate in the other moiety, his title was independent of these respondents ; and if to be secured by a re-entry, he had no right to call on them to make it, or, if otherwise, no reason to expect they would comply in time to prevent intermediate entries. Accordingly he procured warrants, and caused the lands to be entered in his own name; and in so doing did precisely what any prudent man would have done under like circumstances, who was acquainted with the unconscientious greediness of speculators in the Virginia Military District, in seizing upon good unappropriated lands. If he had by this means secured the title to the land, a court of equity might have adjudged him a trustee of respondents, to the extent of their claim, they being at their share of the expense. This would be going far enough. It would not regard his claim of the entire benefit of the entry, a discharge from the contract, because his exclusive claim could only be resisted in virtue of the contract: The relation of vendor and vendee existing between them would not be destroyed by the new entry, but the latter would be modified, and have effect consistent with the equities arising from that relation, coupled with the attending circumstances of the case. When, therefore, the suit was commenced in the circuit court, the contract was open and obligatory upon both parties. 'The title of the land was different, however, from what both supposed it, and was sufficiently doubtful to justify a resort to a court of equity to have all doubt removed ; and if incapable of removal, to justify a decision. No mai should be compelled to part with his money on a *363 doubtful title. Common prudence forbids it, and equity never requires •it. In fact, the respondents had at that time no title at all. It is true, the act of Congress, approved in 1836, as held by the Supreme Court, operated to vest a title in the heirs, etc., of Charles Bradford, but down to the very moment when that opinion was announced many of the best lawyers of this state considered the question extremely doubtful. *There was, then, an apology for the conduct, andan [363 excuse for the delay of payment pending the litigation. On the 14th of May, and within three months after the date of the decree procured at Barr’s instance, affirming the contract, and before any movement had been made by Barr, indicating a change from the course he had previously pursued, (3-alloway tendered to him all that was due, and since then has regularly tendered the residue of the purchase money, as it fell due. The first unequivocal act on the part of Barr, indicating a desire to put an end to the contract, was his offer to repay, in -June, 1839, the $1000 paid in hand. But, admitting his right to rescind, this was not sufficient. He should have reconveyed an undivided moiety, and the life estate in the other moiety of the land in Brown county, or returned the $104.13 indorsed on the note due January 1, 1839. In order to work a recision of the contract he should have done all that was necessary to place the complainant in statu quo. But the effort, if properly made in other respects, was too late in point •of time. If he desired to take advantage of the delay in payments to resist a specific performance, he should have been prompt — should have made his tender of the $1000, etc., with the money paid to Stewart on the note for $2000, within a reasonable time after the default upon which he intended to rely. Instead of doing this, he treated the contract as subsisting long after the notes were protested —urged it in his answer — insisted upon it in argument, and did nothing to the contrary until the Supreme Court decided that he was able to make a good title, and until G-alloway had secured that title to himself, by making his tender of all that was due. As the purchase money, although tendered, was not duly brought into court, the complainant will take a decree without costs.
Decree for complainant.