## CLEVELAND, CINCINNATI, CHICAGO & ST. LOUIS RAILWAY COMPANY v. MOORE, RECEIVER, ET AL.

[No. 20,995.    Filed October 18, 1907.    Rehearing denied May 1, 1908.]

1. CONTRACTS.—*Construction.*—*Fairness.*—A contract must be construed, if possible, so as not to work an injustice. p. 339.

2. SAME.—*Railroad Construction.*—*Changes in Plans.*—A provision in a railroad construction contract authorizing the company to change the plans and location, means only such incidental changes as might reasonably be expected in such work, and does not authorize any radical departure from the work as outlined in the plans and specifications. p. 340.

3. SAME.—*Plans and Specifications.*—*Construction.*—A railroad construction contract providing that the work shall be done "in accordance with plans and specifications to be furnished and stakes to be set" does not leave the whole agreement unsettled, since such provision must be construed in the light of the fact that the plans and specifications were made a part thereof at the time of the execution of the contract. p. 340.

4. SAME.—*Plans.*—*Unwarranted Changes.*—*Special Findings.*— Where, in an action for money due under a contract for railroad construction, the special findings show that the grade of the road was increased in height, the yard lengthened and widened, an under-grade instead of an over-grade crossing made, the fills increased 61 per cent and the cuts 80 per cent, an unwarranted change is shown from the contract which authorized the company to change the plans and location of the road. p. 341.

5. APPEAL.—*Failure to File Briefs.*—*Reversal.*—Where a part of the appellees have filed no brief, and the case must be reversed as to the principal appellee, who filed a brief, the case may be reversed as to the appellees filing no brief as upon error confessed. p. 341.

6. CONTRACTS.—*Change of Plans.*—*Ignorance Thereof by Contractor's Surety.*—*Special Findings.*—Where the special findings show that the contractor's surety, in attempting to complete the construction of certain railroad grading, did a great amount of extra grading, cutting and filling, at the order of the company's engineer, and without knowledge that such work was not set forth in the plans, no consent to do such work under the contract is shown. p. 341.

7. SAME.—*Extra Work.*—*Compensation.*—Where the surety of a contractor who had agreed to do certain grading and filling for a railroad company, undertook to complete such contract, doing

a large amount of extra work at the order of the company, in ignorance of the fact that such work was not specified in such contract, the measure of damages is not the reasonable value of the entire work as if the entire contract was abrogated. p. 342.

8. CONTRACTS.—*Breach.*—*Damages.*—Where defendant has violated his contract, the plaintiff's damages are determined by ascertaining the amount receivable under such contract, and not by determining the independent value of the service. p. 342.

9. ACTION.—*Breach of Contract.*—*Damages.*—*Assumpsit.*—For a breach of contract plaintiff may sue on such contract, claiming damages, or he may sue in assumpsit for the value of the services performed, not exceeding, in such case, the contract price. p. 343.

10. CONTRACTS. — *Breach.* — *Railroads.* — *Contractors.*—*Sureties.*— Where a railroad company, while its contractor was grading its roadbed, made radical changes in the plans, and the contractor's surety subsequently undertook to complete the contract, such change of plans cannot, as affecting such surety, be construed as a refusal to proceed according to such contract. p. 343.

11. SAME.—*Breach.*—*Rescission.*—A breach of contract authorizing rescission, must be unqualified, and must be acted upon by the party entitled to rescind. p. 343.

12. SAME.—*"Void."*—*Voidable.*—A contract containing an express provision, in favor of one party thereto, that it shall be "void" upon a certain condition, is voidable, upon a breach of such condition, at the election of such party. p. 344.

13. PRINCIPAL AND AGENT.—*Notice.*—*Contracts.*—*Breach.*—*Knowledge.*—Where a surety company's agent was in charge of the construction of certain railroad grading, and he knew of certain changes in the plans of such work, such surety company is conclusively presumed to know of such changes. p. 344.

14. SAME.—*General Powers.*—*Contracts.*—*Construction.*—A general agent of a surety company entrusted by such company with the construction of certain railroad grading, has the implied power to determine the proper construction of an ambiguous contract in reference to such work. p. 344.

15. PRINCIPAL AND SURETY.—*Discharge.*—*Change of Contract.*—The material change of a contract by the principals, without the consent of the surety, discharges such surety. p. 345.

16. SAME.—*Discharge.*—*Waiver.*—A surety who has a right of discharge because of a change in the contract by the principals, may waive such right by subsequent conduct involving knowledge and intent. p. 345.

17. NOTICE.—*Actual.*—*Constructive.*—Notice sufficient to put a person upon inquiry is not always equivalent to actual knowledge. p. 345.

18. NOTICE.—*Actual.—Constructive.—Effect.*—A person having constructive knowledge of a right will not be held to have the equivalent of actual knowledge, unless it would be unconscionable for him to be permitted to deny knowledge. p. 345.

19. ACTION.—*Assumpsit.—Equitable Character of.*—The action of *assumpsit* is governed by equitable principles. p. 346.

20. CONTRACTS.—*Breach.—Extras.—Damages.—Rules Governing.*— Where a surety company, compelled to fulfill its principal's contract for certain railroad grading, employed a general agent to perform such work, and he was provided with the plans for such work and, at the instance of the railroad company, ostensibly under the contract, did a great amount of extra work, his constructive knowledge of the breach precludes his company from recovering the reasonable value for such extra work without regard to the contract rate. p. 346.

21. SAME.—*Breach.—Constructive Notice of.*—A surety company which undertakes to complete its principal's contract for the construction of a certain railroad grading, is, *prima facie*, presumed to know when the contract is violated by the railroad company in demanding radical increases in the amount of work. pp. 346, 364.

22. SAME. — *Breach.—Railroad Grading.—Estimates.—Knowledge of.*— It should be assumed that a contractor for railroad grading has knowledge of the engineer's estimate attached to the plans and specifications, and that extra work is being imposed, where he is ordered to do work which will radically increase such estimates. p. 348.

23. NOTICE.—*Constructive.—Evidence.—Circumstantial.*—Constructive knowledge of a fact may be proved by circumstantial evidence; and upon proof of such knowledge, there is a disputable presumption of actual knowledge. p. 349.

24. CONTRACTS. — *Change.—Knowledge.—Weighing Evidence.—Appeal.*—Where the evidence shows that a contractor saw the changes made in the grades of the work he contracted to perform, he will be held to a knowledge thereof; and a finding that he had no knowledge will not be sustained, on appeal, since it is not supported by the evidence. p. 350.

25. SAME.—*Extras.—Compensation.*—Where the evidence shows that a contractor did extra work, both parties apparently thinking at the time that it was covered by the contract, the compensation therefor should be measured by the contract price. pp. 352, 358.

26. PLEADING.—*Estoppel.*—An estoppel to be available must, ordinarily, be specially pleaded; but a party does not waive the estoppel where he has no opportunity to plead it. p. 353.

27. SAME. — *Complaint. — Contracts. — Extras. — Negativing Estoppel.—Evidence.*—Where a complaint for the performance of extra work alleged facts showing that the work was done in an endeavor to carry out a contract, but further stated that the con-

tractor had no knowledge that such work was materially different from that required by the contract, the demand being for a recovery upon the *quantum meruit*, and not under the contract, the proof must sustain such allegations. p. 353.

28. PLEADING.—*Complaint.—Exceptions.—Anticipating Defenses.*— A complaint which brings the cause of action within an exception to the general rule, does not anticipate a defense; but the facts necessary to establish the exception must be proved. p. 354.

29. SAME. — *Complaint. — Contracts.—Breach.—Estoppel.*—A complaint alleging that, without knowledge, a contractor performed extra work, and demanding compensation apart from the contract rate, a general denial being filed, imposes upon the contractor the duty of showing that such work was done without knowledge, the defendant being under no duty to plead an estoppel in answer. p. 354.

30. ESTOPPEL.—*Equitable.—Purpose.*—The doctrine of equitable estoppel applies to cases at law as well as in equity, and is based upon the ground of promoting the justice of the individual case. p. 355.

31. CONTRACTS. — *Construction. — Equitable Estoppel.*—A plaintiff will not be permitted to insist upon a certain construction of his contract, where his conduct in reference thereto would make it inequitable to the defendant so to construe same. p. 356.

32. SAME.—*Change of.—Notice.*—Where a railroad company employs a contractor to do certain grading, and the company orders certain extra work done, the contractor having knowledge thereof, and making no objection thereto, such contractor can recover only the contract rate therefor. p. 362.

33. SAME.—*Changes.—Compensation.*—Where a railroad company orders its contractor to do work wholly foreign to the contract, it is liable for the reasonable value thereof, regardless of the contract. p. 362.

34. SAME.—*Changes.—Extras.—Engineer's Decision.*—The decision of defendant railroad company's engineer as to extras, as provided for in a contract for grading, does not apply to work caused by unauthorized changes in the contract. p. 363.

35. APPEAL.—*Consideration of.—Questions Not Presented in Briefs.* —Where the Supreme Court is compelled to examine the record, it will determine the case upon the justice thereof, rather than upon the points and arguments in the briefs. p. 363.

36. SAME.—*Decisions.—Objects.*—The object of a decision on appeal should be to determine the substantial justice of the case. p. 364.

37. PRINCIPAL AND SURETY.—*Surety's Performance of Principal's Contract.—Rights.*—A surety, in the performance of the principal's contract, stands, so far as concerns the collection of the compensation therefor, in the same position as the principal. p. 366.

From Superior Court of Marion County (62,156); *Vinson Carter,* Judge.

Action by City Trust, Safe Deposit & Surety Company (J. Hampton Moore, as receiver thereof, being substituted therefor on appeal) against the Cleveland, Cincinnati, Chicago & St. Louis Railway Company. From a judgment for plaintiff, defendant appeals. Appealed from Appellate Court under subd. 3, §1394 Burns 1908, Acts 1901, p. 565, §10. *Reversed.*

*L. J. Hackney* and *Elliott, Elliott & Littleton,* for appellant.

*F. Winter,* for appellee.

GILLETT, J.—This action was commenced by City Trust, Safe Deposit & Surety Company against appellant, to recover for extra work done in connection with a railway construction contract. Appellant filed a cross-complaint to recover on a bond, in the sum of $10,000, executed by appellee McNerney, as principal, and appellees surety company and Johnson, as sureties, conditioned on the performance of said contract. No further statement of the issues appears necessary. There were special findings filed, together with conclusions of law thereon, and, pursuant to said conclusions, the court rendered judgment for the surety company upon its complaint, and in favor of all of the appellees, that appellant take nothing by its cross-complaint.

The findings are very long, and we shall only attempt an outline of the more important facts therein set forth. It appears that in June, 1899, the railway company invited bids for the construction of what it termed the "South Anderson cut-off," according to plans and specifications. The notice contained the approximate estimate of the chief engineer of said railway company of the number of yards of earth to be placed in the embankment, and in the number of yards to be excavated within the normal cross-section, as well as the quantity which was to be taken from widened cuts and bor-

row pits. The estimated length of the greatest average haul was also stated in said notice. The contract was let to McNerney, for fifteen cents a yard, measured in embankment, and he was to be allowed twelve cents a foot for track laying. These prices were but one-half of the reasonable value of the work, as the railway company well knew. The work involved the building of about 18,500 feet of main track and 16,000 feet of yard track, and the contract provided that the work was to be done in accordance with plans and specifications to be furnished, and stakes to be set, by the railway company, but the plans and specifications were in fact attached to the contract when it was executed. It was provided in said contract that the location and plan of the work might be changed by the chief engineer of the railway company, and that if the grade and quality of the work was not thereby affected, and the change only involved an increase in quantity, the contractor should have no extra claim; but it was provided that, if the grade and quality of the work was affected, then the engineer was to determine the amount of increase or deduction. By further limitation it was sought to cut off all claims for extras, unless ordered by the chief engineer, and it was required that prompt notice be given of all such claims. It was further provided that the chief engineer's decision on the question of claims for extras was to be considered as in the nature of an award and conclusive upon the parties. Another clause of the contract provided that the quantities set forth in the notice to bidders were to be considered as estimates only, and that the company might increase or decrease them as it might elect. The sixth clause of the contract reduced the width of the embankment for the main track, as fixed in the specifications, from twenty feet to fifteen feet. The slopes of the fills and cuts along this track were fixed at a ratio of one and one-half horizontal to one vertical. The excavations and embankments for yard tracks were to be of such widths and slopes as the engineer might direct. He was also authorized to

fix the widths of cuts and of the points where earth was to be borrowed. He was also empowered to require all further embankments and excavations which, in his opinion, were necessary for the construction of the railway. The specifications provided that no allowance was to be made for hauling. The plans showed that the yards were to consist of five tracks, in addition to a passing track, and that a highway, known as the Anderson & Fall creek pike, was to be carried across the railway by an overhead bridge. The substance of the bond has been already stated. After the execution of the contract McNerney commenced work thereunder, and continued until the early part of November, 1899, when he refused to proceed further and abandoned the contract. The railway company then called on the surety company to perform such contract, and it thereupon took upon itself, as such surety, the prosecution of the work, and continued therein, with all due diligence, until June 23, 1900. November 23, 1899, said company took an assignment of the contract from McNerney, but the assignment was not reported to the railway company, nor assented to by it. The findings then show extensive changes in said work, made from time to time by the engineers of the railway company. The first change was made in accordance with what is termed the May, 1899, profile, by which the grade was gradually raised from station 60 to station 151, at which point there was a departure of four and two-tenths feet from the original grade. From thence the new grade gradually approached the former until station 185 was reached. The length and width of the yard tracks were next increased and a Y track added, by which the tracks, other than the main track, were increased from 15,060 feet, to 40,435 feet, and subsequently the overhead crossing was changed to a subway, thereby changing what had been designed as an embankment, containing 17,416 yards, to an excavation to the extent of 29,073 yards, the most of which was hard-pan. After reciting the facts of the various changes, the court finds: "According to

such changed plan the entire amount of work of excavation and embankment required, including that which had been done by the defendant McNerney and the plaintiff, was 148,-767 cubic yards measured in embankment, including 8,000 yards measured in excavation. The increases were all in the sections or stations where defendant McNerney and the plaintiff had worked. By the plans attached to the contract the work in these sections consisted, exclusive of the approaches to the Anderson & Fall creek pike, of 59,230 yards of embankment, or 69,682 yards measured in excavation, and, including the approaches to the Anderson & Fall creek pike, of 76,646 yards of embankment, or 90,171 cubic yards measured in excavation, and 66,701 yards of cuts, making it necessary to borrow 23,570 cubic yards. The changes increased the work between these stations to 123,291 yards of embankment, or 145,048 cubic yards measured in excavation, and 119,945 yards of cuts, a difference of 46,645 yards of embankment, and 53,244 of cuts, making it necessary to borrow 25,103 cubic yards.'' The average haul of each yard of earth handled was increased from 1,406 feet to 1,588 feet. The change in the yards required 85,800 yards of excavation. There are also findings that the surety company conformed to the orders and directions of the railway company and its engineers in doing the work, in the belief that the same was being done according to the contract, and that said surety company performed said work without any knowledge or belief that any change had been made in the grade and quality of it as shown in the specifications and plans, or that any substantial change had been made in the quantity of work as disclosed by the plans, and also that said company did not at any time consent to any of said changes. In the latter part of May, 1900, the surety company, believing that mistakes had been made by the defendant railway company in the estimates, employed an engineer to estimate such work. It was further found that the chief engineer did not make a change in the plan and profile, and that when the surety

company made a claim to him for extras, in June, 1900, he refused to allow it on the ground that the grade had not been changed, except as to the highway, and that that change was beneficial to the surety company. The amount of work done by the surety company prior to its abandonment of the undertaking is found to be 62,306 yards, measured in embankment. Of this 35,663 yards were included in the work as originally planned, and the remaining quantity, 26,643 yards, was made necessary by the change. The value of the work of building the embankment was found to be thirty cents a yard, and that it was worth sixty cents a yard for excavating and placing hard-pan in embankment. The value of the extra haul was fixed at one hundred and eighty-two thousandths cent a yard. It is found that appellant let the work of a third person to complete, and the amount of said company's damages, on account of a failure to carry out the contract as modified, is stated, conditional, of course, upon the question whether the facts found disclose a right of recovery. Of the statement of account, on which the court based its conclusion of law in favor of the surety company upon its complaint, it is only necessary to say that the disputed items are the allowance of thirty cents a yard for 26,643 yards of embankment, the crediting of the value of the extra haul on the embankment included within the work as originally planned, and an allowance for 500 yards of hard-pan, included within said first item, at thirty cents extra per yard.

The evidence on behalf of the surety company shows that James M. Shaw, who had been acting as resident assistant secretary and resident vice-principal at Indianapolis signed the bond; that he was placed in charge of the work by the surety company in November, 1899, and that he continued in that capacity until said company abandoned the undertaking. . When he took charge of the work he received from McNerney the contract, together with the plan and profile. Shaw testified on his direct examination that he had no

knowledge of any change in the grade as fixed by the profile attached to the contract. On cross-examination he testified that he knew that stakes were set widening the yard, after he took charge of the work; that the engineers then said that they wanted to put in additional track or tracks; that he consulted the plan, and knew that the contract allowed them to make certain changes which involved only quantities; that he understood that to be within the scope of the contract; that he knew at the time that that was a change in the plan; that he understood that widening the yard was not modifying the contract, and that widening a cut was a change in the blueprint and plan attached to the contract; that he was notified about May 1, 1900, that the plan had been changed so as to require a subway for the highway crossing. It also appears from his testimony that considerable work was done after notice was received of these changes. On re-direct examination he testified that in what he had said concerning a change in the plans he had reference to a change in the stakes. The evidence shows that the railway yard was fully doubled in size, and that, aside from 6,821 yards of embankment, put in to fill a low place lying partly within the original yard and partly within the extension thereof, the rest of the work on the yard consisted of excavation, to the extent indicated in the findings of the court. The earth thus excavated went into fills on the grade. It appears quite clearly from the evidence given by the surety company that the extending of the railroad yard followed, as a direct or secondary consequence, the first change of plan, whereby the grade was raised, and that the great increase in excavation work at that point was to the prejudice of said company. The June profile was drawn after the manner of profiles. Both the grade line and the contour of the natural surface of the earth were traced thereon. There were vertical lines showing stations at each 100 feet, and these lines were inter-

sected by horizontal lines, in such manner as to form squares, the margin of the profile indicating, however, that from one horizontal line to the next was five feet. Within these squares there were drawn on a part of the profile other horizontal lines, apparently designed to aid in calculating the grade in feet, between the multiples of five, at the various points above and below the natural contour of the earth. From station 185, where McNerney commenced, to station 158, the work was almost wholly in cuts, and from the latter station to station 151, the point of greatest departure between the plan as carried out and the June profile, an embankment was to be constructed. At the latter point the profile indicates that the embankment was to be approximately six feet high. Concerning Shaw's knowledge of said profile, he testified, in identification of McNerney's copy, that that was the one he carried, and that the men who were working under him referred to it; that in the latter part of March, 1900, he asked the chief engineer at Cincinnati for the profile under which they were working, as the men in charge of gangs at either end of the work needed a profile, and he wanted one at the camp, where he kept his copy in a frame; that he said to the chief engineer that he wanted a copy so that he could make his computations as he was doing the work; that, upon being furnished with the other profile (it being the same as his), he took it back to camp and put it in a frame, which was so arranged that he could take it out when he desired, and when he did not want to carry it he could put it in the frame. It is inferable from the testimony of appellant's assistant engineer that, notwithstanding the great changes in the work, Shaw treated the June profile as the one he was working by until after his visit to the chief engineer, as the witness claims that, upon examining the profile so furnished, he told Shaw that it did not show the grade lines that he (the witness) was working by. Appellant offered evidence to show that Shaw received partial estimates from month to month, based on the con-

tract, down to and including May, 1900. According to the testimony offered by the surety company, the chief engineer had no knowledge that there had been a change in the grade, at least· he expressed ignorance thereof afterwards, when the parties were seeking to adjust their differences.

In considering the rights of the parties, the threshold question appears to be whether, under the findings, the provision of the contract authorizing the chief engineer to change the location and plan of the work afforded a legal warrant for the changes. There were three great departures from the plans in respect to the earth required to be handled: (1) In the height of the grade; (2) in the length and width of the yard; (3) in the change in the highway crossing.

We may doubtless assume, what the evidence in fact shows, that the cost of hauling earth is a most important element in railway construction work, and that a contractor, bidding on work, for which he is to be paid by embankment only, can make no intelligent estimate whatever unless he knows that the grade is to be substantially maintained, because he must consider, from the distribution of cuts and fills along the work and the points where earth is to be borrowed or wasted, what it will cost him to complete the undertaking. The changes which were made in this case increased the average haul 182 feet. The great increase in the ratio of cuts to fills will also be noticed. Accepting the figures of counsel for the surety company, the cuts were increased eighty per cent, while the fills, which alone counted for the contractor, were increased sixty-one per cent. If changes as radical as those mentioned can be admitted as within the authority of the railway company to make, the price fixed would have afforded the contractor little or no assurance that he would receive a compensation satisfactory to himself, and this must be considered in connection with the fact that the contract attempts to conclude the contractor by the judgment of appellant's own representative as to the extent of allowances for extras. It also

seems doubtful whether the changes made, important as they were, could be said, for the most part, to be changes in grade or quality, so as to come within the provision of the contract for the allowance of extras. Assuming, in accordance with the contention of appellant's counsel, that the undertaking of a compensated surety or guarantor is not to be as narrowly construed as in the case of one who binds himself as a matter of accommodation, yet this does not appear to us as a case involving a close question of construction. Except as controlled by other considerations, a court should, in construing a contract, give to it a construction that will not work injustice. *Noonan* v. *Bradley* (1869), 9 Wall. 394, 407.

2. A contract is supposed to have a subject-matter, and a provision for changes in plan and location does not authorize radical departures from the work as mapped out in the plans and specifications attached to the contract, but only authorizes such incidental changes as might have been fairly regarded as necessary to complete the work according to the general intendment. *United States* v. *Freel* (1899), 92 Fed. 299; *United States* v. *Freel* (1900), 99 Fed. 237, 39 C. C. A. 491; *United States* v. *Freel* (1902), 186 U. S. 309, 22 Sup. Ct. 875, 46 L. Ed. 1177; *Wood* v. *Ft. Wayne* (1886), 119 U. S. 312, 7 Sup. Ct. 219, 30 L. Ed. 416; *City of Elgin* v. *Joslyn* (1891), 136 Ill. 525, 26 N. E. 1090; *Erfurth* v. *Stevenson* (1903), 71 Ark. 199, 72 S. W. 49; *Swasey* v. *Doyle* (1901), 88 Mo. App. 536.

3. The fact that the contract provided that the work was to be done "in accordance with plans and specifications to be furnished and stakes to be set" by the railway company did not leave the whole matter as to the nature of the undertaking unsettled, since said provision is to be construed in the light of the fact that the plans and specifications were attached at the time of the execution of the contract. See *Penn Mut. Life Ins. Co.* v. *Norcross* (1904), 163 Ind. 379. Although the findings are somewhat

Cleveland, etc., R. Co. *v.* Moore—170 Ind. 328.

evidentiary in character, we think that it may fairly be deduced therefrom that unwarranted changes from the plans were made by appellant's engineers, who were charged with the duty of staking out the work, and that by reason thereof the surety company, without any knowledge or belief that such changes had been made, was led to perform a large amount of additional work, to its prejudice. The findings therefore seem to make out a defense to appellant's cross-complaint, but this question need not be definitely determined now, since, for reasons hereafter stated, a new trial must be awarded, and therefore the ultimate settlement of the question suggested must await the main case.

Although appellees McNerney and Johnson filed answers to the cross-complaint, we are unable to say that they did not consent to the changes. The situation of said parties is that appellant's counsel make no distinct point as to them, as apart from the surety company, and they, on the other hand, although challenged by the assignments of error, have not filed a brief. In these circumstances we have concluded, since complications may arise from any other course, to reverse this case as to them, without prejudice, however, as upon error confessed.

Referring again to the case as between appellant and the surety company, as presented upon the findings, we have to say, in answer to the claim of appellant's counsel, that the practical construction of the parties shows that the changes were warranted, that so far as the findings go they place an absolute negative upon the idea that the surety company consented to any of the changes. With this we dismiss the contention of counsel for appellant that a conclusion of law ought to be stated in its favor upon the issues formed under the cross-complaint.

Taking up the case of appellee surety company, whereunder it seeks an affirmative recovery, we observe that the

court adopted the principle of allowing said company for embankment included within the June plan at the contract rate of fifteen cents per yard, and for all additional embankment at the rate of thirty cents per yard, and that it also allowed as extras for additional hauling of earth moved under the contract, and for the excavation of hardpan. It is first sought to justify these additional allowances on the theory that the very making of the changes *per se* worked an abrogation of the entire contract, even for the purposes of damages, and from this proposition it is argued that the allowances in excess of the contract were warranted on the theory that the surety company was entitled to recover the reasonable value of the entire work. In this contention we are of opinion that counsel for said company are in error. It is one thing to affirm that said company was discharged from its collateral instrument of guaranty, and it is quite another thing to assert that thereby it became authorized to recover, without regard to the principal contract, for work done pursuant thereto. It was stated by Parke, B., in *Robinson* v. *Harman* (1848), 1 Exch. 850, that "The rule of the common law is, that where a party sustains a loss by reason of a breach of contract, he is, so far as money can do it, to be placed in the same situation, with respect to damages, as if the contract had been performed." So it was declared in *Alder* v. *Keighley* (1846), 15 M. & W. \*117, to be a clear rule "that the amount which would have been received if the contract had been kept, is the measure of damages if the contract is broken."

So far at least as this court is concerned, it stands committed to the doctrine declared in the leading case of *Doolittle & Chamberlain* v. *McCullough* (1861), 12 Ohio St. 360, that the fact that the contract has been violated by the defendant does not authorize the plaintiff to recover under a *quantum meruit* for work comprehended within, and done under, the special contract, in excess of the

price which the contract fixes as the compensation for the doing of such work. *Louisville, etc., R. Co.* v. *Hollerbach* (1886), 105 Ind. 137; *French* v. *Cunningham* (1898), 149 Ind. 632. It was said in the latter case: ''When the person employed is doing the work according to contract, and is prevented from completing the same by the other party, in violation of the terms of said contract, the person so prevented from performing his part of the contract can recover the reasonable value of his work, not exceeding, however, the contract price on the *quantum meruit*, or he may sue upon the contract for the breach thereof, and the measure of damages is the amount that will compensate him, which will include the reasonable value of his work, as well as loss, if any, on account of not being allowed to complete the same.'' We are not unmindful of the fact that the change in the grade antedated the doing of the work by the surety company, but this should not be construed as the equivalent of an unqualified refusal on the part of the railroad company to go on with the contract, so as to justify the assumption that the parties were proceeding as under an implied contract. It was laid down in *Franklin* v. *Miller* (1836), 4 Ad. & Ell. 599, that it is a clearly recognized principle that if there is only a partial failure of performance, for which there may be a compensation in damages, the contract is not at an end. It is stated in the note to *Cutter* v. *Powell* (1795), 2 Smith's Lead. Cas. (11th ed.), 1, 33, that the refusal which will authorize the rescission of a contract must be an unqualified one, and must be acted on as a breach by the person who has a right to insist upon its performance. See, also, *Robinson* v. *Lake Shore, etc., R. Co.* (1895), 103 Mich. 607, 61 N. W. 1014. It is difficult to understand how it can be that, by an equivocal act on the part of a defendant, a contract is abrogated for the purpose of assessing damages for work done under it, since it cannot be determined

whether the plaintiff, had he been apprised of the breach, would have elected not to be bound, or, by accepting the changed conditions, or suing on the contract for the breach, have confirmed the contract. It was said by Coleridge, J., in *Franklin* v. *Miller, supra:* ''The rule is that, in rescinding as in making a contract, both parties must concur.'' It is held that where a contract contains an express provision, for the benefit of one of the parties, that it shall be 12. void upon a certain condition, the stipulation only means that it shall be voidable at the election of such party, and so here, where the law imports such conditions as exist, we are unable to perceive how we can say that, upon a breach, *ipso facto,* there is no contract. It therefore appears to us that the theory, that all of the work is to be treated as if there were no express contract, is unsound.

Proceeding to the evidence, we have to say that we have reached the conclusion that appellant ought to be awarded a new trial because of the finding of the court as to the 13. surety company's lack of knowledge of the changes. Shaw was in charge of the work for said company, and the presumption that the company knew all facts of which he had knowledge is so violent that the law will not permit it to be controverted, at least for the purpose of working out the rights of the parties in respect to the claim of compensation for additional work done. *Field* v. *Campbell* (1905), 164 Ind. 389, 108 Am. St. 301. More than that, the position of Shaw, so far as we can understand it, 14. was that of a general agent of said company, since he was authorized to transact all of its business at the particular place, and was impliedly vested with discretion to determine questions as to the proper construction of the contract, as an incident to the carrying out of the undertaking committed to him. *Cruzan* v. *Smith* (1872), 41 Ind. 288; *Fatman* v. *Leet* (1872), 41 Ind. 133.

As to the change of grade, made in McNerney's time, there would perhaps be no objection to the view, so far as

the contract may be said upon its face to show its own meaning, that by such change the surety company was discharged. This would seem to leave open, in respect to such liability, only the question as to whether the meaning of the contract can be said to stand as modified by the practical construction of the parties, and this may depend upon acts done with actual, as distinguished from constructive, knowledge of the change. Where a surety has a defense to an action, owing to prior changes in the contract made without his consent, a renunciation of his right of defense would seem to rest on the doctrine of waiver (29 Am. and Eng. Ency. Law [2d ed.], 1092), and the elements of knowledge and intent, in the absence of estoppel, are essential to constitute a waiver. 29 Am. and Eng. Ency. Law (2d ed.), 1095, 1096, 1108. Relative to constructive knowledge, which we shall hereafter more fully consider, it may be said now, with reference to the cross-complaint of the railway company, that notice sufficient to put a party on inquiry is not always the equivalent of full knowledge. 2 Pomeroy, Eq. Jurisp. (3d ed.), §§592, 593, 603. We are of opinion that the doctrine is not to be invoked in every case where the party sought to be charged with knowledge has not been careful (aside, perhaps, from cases in which from certain facts an established presumption of knowledge exists), but rather to cases where his omission to inquire has had such a result that it would be unconscionable, in view of his conduct, to permit him to assert that he had no knowledge. *Kettlewell* v. *Watson* (1882), 21 Ch. Div. 685; *Cleveland Woolen Mills* v. *Sibert, Ward & Co.* (1886), 81 Ala. 140, 1 South. 773; *Acer* v. *Westcott* (1871), 46 N. Y. 384, 7 Am. Rep. 355. Many of the courts, as well as some text-writers, treat the subject of notice as involving constructive fraud. When the surety company, claiming as the assignee of McNerney, becomes an actor, and seeks to recover for the extra embankment, at double the contract

price, the question arises whether, in view of the facts, it ought not, in the attainment of the practical ends of justice, to be charged with such a constructive knowledge of the raising of the grade, that it should not be permitted to recover for all of the extra work wholly apart from any consideration as to the contract price. The action by the surety company practically approximates an action in assumpsit. Equitable principles govern the latter form of action. 4 Cyc. Law and Proc., 320. For this reason, if for no other, we think that it should be held, as the evidence stands, that, on the principle of constructive knowledge, based on notice of facts calculated to put an ordinarily prudent man on inquiry, the surety company should *prima facie* be regarded as having had such constructive knowledge of the changes, and this, coupled with acquiescence on its part, and reliance on such conduct by the railway company, to its prejudice, is sufficient to bring the claim for extras within the influence of the contract, at least to some extent, in fixing the *quantum* of recovery.

It may be admitted that the facts were not sufficient to charge Shaw with constructive knowledge of the change in grade at the time he entered upon the work, but we are unwilling to sanction the view that the surety company did not at any time during the execution of the work stand charged with a constructive knowledge that the grade was changed. Mr. Wharton says: ''But that a person who is *capax negotii* should set up ignorance of facts as ground of exculpation or of defense would be against the policy of the law; and hence, where there is no fraud or coercion, the law treats him as if he were cognizant of what he did. He is not supposed to have known facts of which it appears he was ignorant; but, if his ignorance is negligent or culpable, then the law declares that it cannot protect him. Apart from this liability, we have a right to infer, as a presumption of fact based upon our experience of

business, that an intelligent person who does a thing in his particular line of business knows what he is about." 2 Wharton, Evidence (3d ed.), §1243. In 19 Am. and Eng. Ency. Law, 63, it is said: "One who enters into a contract may be presumed to know all the material facts bearing on that contract." So it is laid down in 16 Cyc. Law and Proc., 1072, that it is a presumption "that a party knew what he had the opportunity of knowing and should have known." Let us therefore look to some of the facts which surrounded Shaw; facts so easily discovered that it seems scarcely conceivable that a man of ordinary prudence, giving his whole energy to the particular business, could have failed to have his attention directed to some or all of them: (1) He found, according to his statement, an embankment 1,000 feet long, between stations 147 and 157, which appeared to be up to the crown stakes and to have been washed down on the sides by rain, and yet he was required by the engineer to add from one foot to one and one-half feet (perhaps we should say one foot) to all of this embankment, as well as to widen it six feet. The actual difference in the grade on this one-thousand feet, as between the two profiles, was four feet, one inch at station 147, four feet, two inches at station 151, and thence gradually descending to the west to station 157, where the grade was increased three feet, three inches. Within these stations, which we refer to because the work there was all embankment, the difference between the area of a cross-section of an embankment built according to the June profile and of one built according to the May profile is surprising when put in figures, but the difference in appearance between two such embankments would be such that the increase could scarcely have been overlooked by one familiar with the profile under which he was supposed to be working. The difference between an embankment six feet high and one ten feet two inches high would be most obvious. (2) The June profile shows the natural surface of the ground to be at grade at stations 98 plus and 131, and ap-

proximately at grade at station 119 plus, and yet the surety company built a twenty-two and one-half-inch embankment at the first of these stations, and a three-foot embankment at the second, while it worked within fifty feet of the third point, where the increase was about two feet. A still more evident deviation is found at stations 161 and 163, where the surety company built over a foot of embankment, although the profile showed at said points about one foot of cut. (3) The grade at which the work was established was so far raised above the grade of the June profile that, roughly judging, the cuts between stations 95 and 110 and between stations 120 and 130 were apparently decreased to the extent of one-third in the first instance and two-thirds in the second. (4) It should be assumed that the engineer's estimate was within Shaw's knowledge, since, as respects the execution of the work, it was only secondary in importance to the contract, specifications, plan and profile. In getting at the extent of the departure from this estimate, we shall, for the sake of convenience, consider all of the changes as if made at once, for that brings out in bold relief the question as to the correctness of the court's finding that the surety company had no knowledge of changes in the grade or quality of the work. The estimate showed 113,000 cubic yards of embankment, to be obtained from 65,000 yards normal cross-section, 27,000 yards widening of cuts, and 21,000 yards from borrow pits. The reduction in the width of embankment from twenty feet to fifteen feet, according to the finding of the court amounted to a reduction of 10,000 yards in embankment. The elimination of the overhead crossing reduced the embankment 17,416 yards, and by deducting these two items we have 85,584 yards of embankment, or, making due allowance for shrinkage, nearly enough, within the normal cross-section and widened cuts (without resorting to borrow pits) to build the embankment, and yet Shaw was cognizant of the widening of the yard, which doubtless afforded about 50,000

extra yards of earth, and was advised of the subway change, which involved excavation to the amount of 29,000 yards. Seemingly, the enlarging of the yard was in itself a fact strongly calling for inquiry, in view of the fact that the excavation within the normal cross-section, as well as earth borrowed at the west end, was also being used in the fills, and if he gave the slightest attention to the general plan of obtaining embankment, as indicated by the estimate, it would seem that he would have perceived that putting all of this excavation on embankment meant that there had been a change in the grade. The testimony of Shaw clearly implies that he had in mind the question of the right of the railway company to require him to place this additional earth upon the grade, for, in response to the question as to whether he examined his plan when the direction was given to him to widen the yard, he answered: "I consulted the plan, and I knew the contract allowed them to make certain changes, which involved only quantities. That I understood to be within the scope of the contract." (5) The net amount of embankment called for was 85,584 yards, and yet, although the general undertaking was far from completed when the surety company abandoned the work, we find that said company was credited at that time, on account of the contract, with 82,456 yards of embankment, the most of which was represented by current estimates. In these circumstances the average man in Shaw's situation would have been likely, before many months after he had entered upon his work, to be seeking the reason for the fact that there was a great discrepancy between the amount of work remaining as shown on paper from what appeared on the ground.

Notice of facts putting a person on inquiry may be proved circumstantially, and, if proved, the deduction therefrom, as to its effect, in the absence of any showing that information was unsuccessfully pursued, is a requisite of the law. 2 Pomeroy, Eq. Jurisp. (3d ed.), §§595, 596,

Of course we realize that the fact of notice concerning the matters which we have pointed out as together amounting to notice is built on rebuttable presumptions, yet, as the presumptions referred to have judicial sanction, they ought to be adopted in the absence of explanation, and if not adopted, where they seem as cogent as in this case, it is ground for a new trial. See Phillips, Evidence (3d ed.), 439. In *Kennedy* v. *Green* (1834), 3 Myl. & K. 699, 722, it is said: "Whatever is notice enough to excite attention and put the party on his guard, and call for inquiry, is also notice of everything to which it is afterwards found that such inquiry might have led." When a party has sufficient knowledge of a fact he shall be deemed conversant with it. In 21 Am. and Eng. Ency. Law (2d ed.), 590, it is stated: "But when from the uncontroverted facts in evidence it appears that circumstances existed of which the party sought to be charged had knowledge or information sufficient to affect his conscience, and thereby put him upon inquiry which, if followed with reasonable diligence, would necessarily have led him to actual knowledge of the particular fact, and his failure to make the inquiry is not satisfactorily explained, he will be held chargeable with the knowledge which he might thus have acquired, and will not be allowed to say that he did not actually know that the fact existed. His knowledge of the circumstances being sufficient to make it his duty to inquire and to render any inaction on his part unconscientious, his failure to pursue the path of duty is no defense or excuse. Under such circumstances it is said that the presumption of notice is conclusive." See, also, *Webb* v. *John Hancock, etc., Ins. Co.* (1904), 162 Ind. 616, 635, 66 L. R. A. 632.

It can but be inferred from the evidence that Shaw made no inconsiderable use of his profile, and his familiarity with the contract may be inferred both from the evidence and the fact that he had it in his possession as the representative of the surety company. Making all

due allowance for the misleading effect of the change in grade stakes, yet he knew that they were being changed to some extent, and that the contract purported to give to the railway company an undefined latitude concerning changes, and therefore, in view of the fact that the general change of grade produced consequences so obvious that no man could fail to observe some or all of them if he was giving heed to the business, we are of opinion, in view of the presumption of knowledge of surrounding facts to which we have heretofore adverted, that explanations were called for on Shaw's part, and that his general statement that he never questioned whether the grade stakes were set in accordance with the June profile ought not to be accepted as sufficient. There is too much to suggest a turning away from knowledge upon the part of a man of ordinary prudence—the standard by which the surety company must be judged—to allow this bald statement to pass muster. If Shaw never questioned the manner in which the grade stakes were set, it may yet remain that he ought to have questioned them, and this, under the law, since the most casual comparison of the grade as he had constructed it with his profile would have instantly revealed the truth, is equivalent to knowledge. It therefore appears to us that the case is not one involving the weighing of conflicting evidence, but is one in which the court below misapprehended the scope and legal effect of the evidence. *Field* v. *Campbell* (1905), 164 Ind. 389, 108 Am. St. 301. If the railway company is to be charged with the consequences of a deviation from the plan, to work a discharge from the guaranty, then the change must be accepted as the railway company's act for all purposes, and we have therefore *prima facie* a deviation from the plan on its part together with constructive knowledge thereof, and want of objection on the part of the surety company.

Our view is that the court's finding on the question of knowledge is not borne out by the evidence, and that from

this cardinal misconception of the force of the testimony the court has doubtless failed to find the further facts which would make out an equitable estoppel, at least to the extent of precluding the surety company from questioning the application of the contract as affording a basis for the adjustment of the rights of the parties. In *Board, etc.,* v. *Byrne* (1879), 67 Ind. 21, Worden, C. J., speaking for this court, said: *"Prima facie,* the contract price for the like kind of work ought to govern for the extra work." There being a deviation from the contract by consent of parties—and, as we have indicated, we are of opinion that as to a part of the additional work at least the surety company should, as the evidence stands, be charged with the consequences of acquiescence in the change—the general rule is to trace the contract into the extra work, so far as it can be said to furnish a conventional admeasurement of the value which the parties themselves have placed upon the work. *Jones* v. *Woodbury* (1850), 11 B. Mon. 167; 2 Sedgwick, Damages (8th ed.), §655; 2 Parsons, Contracts (9th ed.), *58; *Koon* v. *Greenman* (1831), 7 Wend. *121; 2 Sutherland, Damages (2d ed.), §707; *M'Cormick* v. *Connoly* (1802), 2 Bay (S. C.) 401; Lloyd, Law of Building, p. 85. In *Merrill* v. *Ithaca, etc., R. Co.* (1837), 16 Wend. *586, 30 Am. Dec. 130, which was an action for work done in the construction of a railroad, it appeared that the plaintiffs, under the direction of the engineer, had worked upon sections of the road not embraced in the written contract, but the whole work was done, estimates made, and payments received, as if it were all embraced within the contract. The court, speaking by Cowen, J., said: "After such an exact tacit adherence, on the side of the plaintiffs, as appears from the evidence in this case, to the written terms of the contracts, without one word that they intended to alter their rates of charge, it would be a fraud upon the company were they allowed to change their ground. It is not denied that they may resort to the general counts. Both parties having

assented that the work should go forward after the day, that may be so. It is clearly so as to line C and section four, if they are not touched by the general provisions of the contract in respect to section three; yet the rule is well settled, that though there be a deviation, yet the special contract shall be pursued as far as it can be traced and made to apply. Here all the powers of the engineer in chief, with the measures and estimates, may be retained and applied to the whole work, with very little exception. For a plain excess beyond what the parties may have treated as within the articles, there could of course be no objection to allow on the basis of a *quantum meruit.*"

It is true that there is no plea of estoppel in this case, and we are aware of the general rule of code pleading that an estoppel *in pais* must be specially pleaded. It is, however, a well-recognized exception to the rule that a party does not waive the estoppel where he has no opportunity of pleading it. *Foye* v. *Patch* (1882), 132 Mass. 105; *Clink* v. *Thurston* (1873), 47 Cal. 21; note to *Tyler* v. *Hall* (1891), 27 Am. St. 337, 344; *Shurtz* v. *Colvin* (1896), 55 Ohio St. 274, 45 N. E. 527; Bigelow, Estoppel (4th ed.), 669; 16 Cyc. Law and Proc., 806. The determination of the question whether the railway company had the opportunity to plead the estoppel requires a consideration of the surety company's complaint.

Instead of relying on a common count, as is ordinarily done in such cases, the pleader saw fit to plead the contract specially, and the fact was revealed in the complaint that the plaintiff did the work in its endeavor to carry out the contract. This then at once gave rise to the question whether the deviation was by consent of parties or otherwise, for in the former case the measure of damages would have *prima facie* been based on the contract price, whereas the plaintiff was seeking to recover the reasonable value of what it had done. To avoid this objection it alleged that it had

"no knowledge or reason to believe that the work was required to be, and which was done was materially different in grade, quality, or quantity from that which was required to be done by said contract and specifications and blueprints attached thereto." The consideration suggested rendered the allegation a proper one, for it is not anticipating a defense to state facts which bring the plaintiff's case within an exception to the general rule. *Latta v. Miller* (1887), 109 Ind. 302; *Lake Erie, etc., R. Co. v. Holland* (1904), 162 Ind. 406, 63 L. R. A. 948; *Wade v. Rusher* (1859), 4 Bosw. (N. Y.) 537; 4 Ency. Pl. and Pr., 614. Having done this, it became necessary for the plaintiff substantially to prove its negative allegation, since it was of the gravamen of its case. *Goodwin v. Smith* (1880), 72 Ind. 113, 37 Am. Rep. 144; *Nash v. Hall* (1853), 4 Ind. 444. While the course pursued by the pleader was authorized, yet the question arises as to what position it put the defendant in, whose answer, under the code, was required to consist of a denial, or "a statement of any new matter constituting a defense." §352 Burns 1901, §347 R. S. 1881. In the circumstances the railway company could not plead an estoppel, for the major allegation of such an answer must have been that the plaintiff did know of the changes, and this would have been neither a denial nor the allegation of new matter, but an affirmative allegation of the existence of a fact which the plaintiff, owing to the form of complaint adopted, found it necessary expressly to deny. *Shurtz v. Colvin, supra.* The plaintiff having, by the pleading, made out a case on the theory that the extra work was, as it were, foisted on it, it was not at liberty to change front and insist that it was immaterial whether an allegation of a want of knowledge was proved if the defendant did not plead an estoppel affirmatively. The latter had a right to join issue on a material allegation of the complaint, and to try the truth of that allegation. See note to *Tyler v. Hall, supra,* at page 346. It therefore appears to us that the ques-

tion of estoppel was in the case, and that, if the court's finding was erroneous on the major question as to whether the surety company in legal effect had knowledge of the change, a new trial ought to be awarded.

In considering the question whether the surety company is estopped, it must be remembered that by its complaint it charges the railway company with no more serious offense, in legal effect, than a misinterpretation of its own contract. The doctrine of equitable estoppel, which is no longer peculiar to courts of chancery, is based on the ground of promoting the equity and justice of the individual case, and it is not to be carried further than the end for which the estoppel is created. 2 Herman, Estoppel, §782. In the work to which we have just referred it is said: "This equitable estoppel involves a question of legal ethics, the doctrine lies at the foundation of morals, and applies wherever a party has made a representation, by words or conduct, which he cannot in equity and good conscience prove to be false; and this kind of estoppel, being a broad doctrine of equity, cannot be limited in application by the terms of any narrow legal definition." 2 Herman, Estoppel, §749. It is also laid down in the work just cited that, "a person who intentionally or by culpable negligence induces another to act upon his representations will be estopped from denying their truth. Under the circumstances creating the estoppel, representations made by words, acts, or silence when duty requires the party to speak are conclusively presumed to be true as against him and in favor of the person whom he has misled. The estoppel is called into life for the purpose of preventing wrong and redressing injury." 2 Herman, Estoppel, §788. This court has said: "The vital principle of an equitable estoppel is that of fraud. He, who by his language or conduct, leads another to do what he would not otherwise have done, will not be permitted to subject such person to loss or injury by disappointing the expectations upon which he acted. * * * Nor is it

necessary that there should exist a design to deceive or defraud on the part of the person sought to be estopped. It is enough if when he asserts his claims it would be inequitable and unjust to allow him to prevail against the purchaser. The falsehood and moral wrong which the law denominates fraud appears when the claim is asserted. And this is true whether a party knowingly remains silent or so negligently conducts himself with reference to his rights as to mislead another." *Kiefer* v. *Klinsick* (1896), 144 Ind. 46, 54. And see on the subject of estoppel by negligence, 3 Canadian Law Times, 223. It was said in *In re Hall* (1841), 10 L. J. C. P. 210, 212: "*Lala culpa et crassa negligentia* both by the civil law and our own, approximate to and cannot be distinguished from *dolus malus,* or misconduct."

It is evident that, for the purpose of determining whether a plaintiff shall be given the right to insist upon a certain construction of a contract, much may depend upon the consideration as to whether it is just in view of the manner in which he has conducted himself and the effect upon his adversary, to accord him that right. It was said in *Kirk* v. *Hamilton* (1880), 102 U. S. 68, 26 L. Ed. 79: " 'What I induce my neighbor to regard as true is the truth as between us, if he has been misled by my asseveration.' " In the note to *Duchess of Kingston's Case* (1776), 2 Smith's Lead. Cas. (11th ed.), 731, 865, it is laid down that the courts, perceiving how essential it is to the quick and easy transaction of business that one man should be able to put faith in the conduct and representations of his fellow, are inclined to hold such conduct and such representations binding where a mischief or injustice would be caused by treating their effect as revocable. The case of *Leather Manufacturers Bank* v. *Morgan* (1886), 117 U. S. 96, 6 Sup. Ct. 657, 29 L. Ed. 811, is illuminative upon the proposition that where there is owing on the part of a person the duty of disclosing the invalidity of a writing, his negligent omission so to do may estop him from raising

the question after the other party has acted to his prejudice. It was there held that a bank depositor owes some duty to the bank to examine his returned checks, and that if by his negligence therein the bank is led to treat as valid a series of raised checks, bearing the depositor's signature, he will be estopped from denying their validity. In that case Mr. Justice Harlan, after considering the cases on the subject of estoppel by negligence, said: ''These cases are referred to for the purpose of showing some of the circumstances under which the courts, to promote the ends of justice, have sustained the general principle that, where a duty is cast upon a person, by the usages of business or otherwise, to disclose the truth—which he has the means, by ordinary diligence, of ascertaining—and he neglects or omits to discharge that duty, whereby another is misled in the very transaction to which the duty relates, he will not be permitted, to the injury of the one misled, to question the construction rationally placed by the latter upon his conduct. This principle commends itself to our judgment as both just and beneficient; for, as observed by the supreme court of Ohio in *Ellis & Morton* v. *Ohio, etc., Trust Co.* [1855], 4 Ohio St. 628, 667, 64 Am. Dec. 610, while in the forum of conscience there may be a wide difference between intentional injuries and those arising from negligence, yet no man conducts himself 'quite as absolutely in this world as though he was the only man in it; and the very existence of society depends upon compelling every one to pay a proper regard to the rights and interests of others. The law, therefore, proceeding upon the soundest principles of morality and public policy, has adapted a large number of its rules and remedies to the enforcement of this duty. In almost every department of active life rights are in this manner daily lost and acquired, and we know of no reason for making the commercial classes an exception.' ''

In the leading case of *Jones* v. *Woodbury* (1850), 11 B. Mon. 167, Marshall, C. J., said: *''Prima facie,* the em-

ployer has a right to suppose, unless apprised to the contrary, that every proposition as to different portions of the work is made under the contract for the whole, and is intended merely to present to him a choice of modes within that contract. And to get rid of this influence, the undertaker must show either that he apprised the employer that his proposition was a departure from the original design and contract, and would be attended with increased cost, or that it was of such a character as necessarily to carry this information to him. * * * The general principle applicable to the case of a special contract for erecting a house, when in the progress of the work there have been alterations or additions not originally contemplated nor expressly provided for, seems to be that as far as the work can be traced under the original contract, it shall be paid for under that contract, and that the residue which cannot be brought within the contract shall be paid for as if there were no contract. But the safety of employers, and the good faith proper to be observed in all cases, require that this rule should be so applied as not to violate the principles before stated; and they seem to indicate further, that extra work either in quantity or quality, unless done under an express agreement, or at least a statement of the price, should not be charged for at a greater rate in reference to the measure and value price of such work, than the contract price bears to the measure and value price of the work contracted to be done. So that if the contract price was a fourth or a fifth less than the price estimated by measure and value, the extra work should not be estimated at more than three-fourths or four-fifths of its price according to measure and value." See, also, 1 Hudson, Building Contracts (2d ed.), 358. In *Merrill* v. *Ithaca, etc., R. Co.* (1837), 16 Wend. *586, 30 Am. Dec. 130, evidence was offered tending to show that the plaintiffs, who were railway contractors, had been damnified by the neglect of the company in not employing a sufficient number of engineers to

lay out the work, make estimates, etc. In referring to one portion of the work, Cowen, J., speaking upon the assumption that the delay and embarrassment was but the result of oversight or miscalculation, said: "As to section eight, there is no doubt that all the substantial provisions of the written contract should be applied. The prices and estimates of the engineer-in-chief would still be conclusive, though we should allow the action of *indebitatus assumpsit.* It is a mere change of remedy. It would be gross injustice to allow any substantial departure from stipulations, in reference to which the parties all along acted. No matter for the delay, and no matter which party was so unfortunate as to be the innocent occasion of it. It was the business of either to speak out if a change of terms was in contemplation. Silence was equivalent to saying, 'I go on upon the old terms.' It is like a tenant holding over in silence. He shall pay his last year's rent. If one party, by his conduct and silence, leads another to believe that he is at work for him on certain wages, he is estopped and shall not add to his demand." The case just quoted from was followed in *Mc-Grann* v. *North Lebanon R. Co.* (1857), 29 Pa. St. 82. In that case extensive changes had been made in the line of a railroad, in the execution of a construction contract, the agreement providing that the line of the road might be changed. The contractors did not give notice that they would not perform the contract at the time the change was made, and they continued, without objection, to receive estimates based on the contract price until the work was finished, when they sued to recover its value. It was held that the fact that both parties had acted upon the contract estopped them from questioning it, the court adding: "When the change was made in the line of the road, if the contractors wished to abandon the contract, it was their duty to give notice to the company to this effect." In the latter case the court refers to *Shaw* v. *Lewistown, etc., Turnpike Co.* (1832), 3 Pen. & W. (Pa.) 445, wherein the plaintiff

sought to recover on the *quantum meruit,* for work done
under a special contract, on the theory that the acts of the
defendant entitled him to treat the contract as rescinded.
The court there said: "The very work for which he de-
mands compensation was done on the foot of that contract.
Would he have been permitted to go on had he informed the
company that he was working under no contract but what
the law might imply? Most probably he would not; and it
is now too late to apprise it, for the first time, that the terms
had been changed."

It was held in *Davis* v. *Bush* (1874), 28 Mich. 432, that
where contractors for the erection of a building knew that
their employer understood that they were undertaking the
work at a fixed price, they would be estopped from asserting,
after they had completed the work without undeceiving their
employer, that there was no price fixed between them and
that they were entitled to the market value of the work. In
that case the court said: "Was it admissible for the de-
fendants in error after such declaration and admission, and
after such payments and receipts upon the basis of it, to
shift their ground and take an inconsistent position? Were
they at liberty to say that having got all they could by put-
ting one face upon the transaction, they would then repudi-
ate as one no longer of service to them the status they had
thus admitted, and put forward another and inconsistent
position and relation in order to get more? Unless we de-
part from settled principles, these questions must be an-
swered in the negative, even though we should feel that de-
fendants in error would have been warranted in steadily
standing out from the beginning for a different measure of
compensation. If they meant eventually to contend that
their true contract relation with plaintiff in error was one
giving them the right to require him to pay according to the
standard of market value because no price was settled
upon, they should have acted, in dealing with him about the

rate and in receiving pay, consistently with that construction of the transaction, or at least they should have avoided the contradictory and misleading course which was taken." In *Hawkins* v. *United States* (1876), 12 Ct. of Cl. 181, 189, it was said: "This was a clear departure from the terms of the contract, and the claimant might then have declined to follow the directions of the assistant superintendent, and, if they were persisted in, he might have maintained an action against the defendants for breach of contract in preventing him from going on with his work, or he might have notified the defendants that if he furnished such stone as the assistant superintendent required—a stone materially different and more expensive than that called for by his agreement— he should not deliver it under the contract at contract price, but should claim such compensation as the material was worth. Had he thus promptly notified the defendants, they would have had an opportunity to determine whether they would overrule the directions of the assistant superintendent or would go on according to his wishes and construct a more expensive wall than had been contemplated. But this opportunity was lost to them by the claimant's ready submission to the wishes of the assistant superintendent and by his long silence as to any claim for greater compensation. It was his duty, when he was requested to deliver stone of a higher grade and more expensive kind than that contracted for, before he had delivered any such stone and before the defendants had acted upon the change, to have given notice and asserted his intention to demand a higher price therefor. He could not lie by and allow the defendants to go on upon the supposition on their part that they were incurring no extra expense until it was too late for them to recede, and then successfully spring upon them a claim for other and different and greater compensation than had been agreed upon."

It is certainly true that if constructive knowledge of the

change of grade came to the surety company at a compara-
tively early time in the execution of the work, the
railway company was entitled to notice, that it might
determine whether it would, after all, construct the
improvement, in view of the increased cost, under the June
profile, and, even if the knowledge came later, there is much
force in the view that notice should have been given, for if
there was no contract whatever governing the extra work,
fairness to the railway company would have seemed to re-
quire the giving of notice, that the latter might govern it-
self accordingly. Mr. Lloyd, in speaking of provisions in
building contracts for the adjustment of the compensation
for alterations and additions by arbitration after the work
is completed, says: "Experience, however, keeps a dear but
a good school, and those who have a broader knowledge of
such transactions agree that, by some mysterious process of
calculation, things valued afterwards in that way always
cost a great deal more than if contracted for beforehand."
Lloyd, Law of Building, §47. The surety company con-
tinued to receive estimates under the contract, so that there
was an actual dwelling under that agreement. This consid-
eration strongly reënforces the general rule that extras are,
in substantially the same circumstances, to be valued accord-
ing to the contract. We are of opinion that the surety com-
pany did not make out a case for the allowance for all of the
extra embankment at the market price, and that the contract
price ought to have been extended, at least to some of it,
with a possible addition for extra hauling and for the exca-
vation of hardpan—the former, on the theory that the ex-
istence of that fact could not have been discovered until
the work was measured, and the latter, on the theory that,
upon the whole, the railway company should perhaps
have taken notice that work of such a character was
not provided for in the contract. See *Dubois* v. *Del-
aware, etc., Canal Co.* (1830), 4 Wend. 285; *Dubois* v. *Del-
aware, etc., Canal Co.* (1834), 12 Wend. 334; *Dubois* v. *Del-*

*aware, etc., Canal Co.* (1835), 15 Wend. 87; *Merrill* v. *Ithaca, etc., R. Co. supra.* There may possibly have been other extra items of cost in the work as performed, but, in the absence of argument, we shall not go into them.

As to the provision in the contract that claims for extras are to be passed on by the engineer, we take it that such provision has no reference to work which was outside of and occasioned by an unauthorized and unsanctioned change in the contract. *Wood* v. *Ft. Wayne* (1886), 119 U. S. 312, 7 Sup. Ct. 219, 30 L. Ed. 416; 1 Hudson, Building Contracts (3d ed.), 441.

Objection has been urged by counsel for appellant to the sufficiency of the surety company's complaint, but as it appears to us that an amended complaint will be filed, it seems unnecessary, especially in view of what has been said, to pass on the objection urged.

The judgment is reversed, with a direction to the trial court to sustain the motion for a new trial. The court is also directed to permit the parties to reframe the issues.

## On Petition for Rehearing.

*Per Curiam.*—In his brief on petition for rehearing, counsel for appellee, while stating that it is apparent from the opinion that this case has received painstaking consideration, suggests that it seems that the opinion and judgment of this court proceed largely, if not entirely, on grounds not presented. So far as the examination of the testimony set out in the record is concerned, it may be admitted that our consideration has gone beyond the briefs, but our action in that particular was prompted, not by a purpose to search for grounds of reversal, but, because the intricate and perplexing questions of fact made a study of the transcript of the evidence necessary to an understanding of the facts. We were compelled to study the bill of exceptions, and, having done so, we were not at liberty to disregard what our eyes perceived as to the facts in their true

relation to each other. Where resort to the record is necessary, the case will be determined by the record, and in such a case the court will not regard itself as governed by the conceptions of counsel on either side as to the nature of the controlling facts. *Big Creek Stone Co.* v. *Seward* (1896), 144 Ind. 205; *Scott* v. *City of Laporte* (1904), 162 Ind. 34; *State, ex rel.* v. *Board, etc.* (1906), 167 Ind. 276. As to our observations upon the case generally, we may say, in the language of *Big Creek Stone Co.* v. *Seward, supra,* that "if the court were limited to the arguments and reasoning of counsel in its decision of cases, to the exclusion of its own observations, many cases would lead us far from what we understand to be the true object of the court."

In the brief referred to, counsel call attention, among other matters, to what is claimed are inaccuracies in the court's statement as to the height of the grade put in by the surety company, as to where work was done by it, as to the misleading effect of the prior work done by McNerney, of changes supposed to have been required by the railroad company on account thereof, and of the representations made while the work was in progress. Without going to the transcript of the evidence, which is very long and at times difficult to understand, we may admit, for the sake of the argument, that we have been under a misapprehension to the extent suggested by counsel, but an examination of the original opinion will show that we by no means rest our conclusion on the matters referred to, and we should not be understood as holding that the surety company *prima facie* stands charged with the consequences of knowledge at any particular time in the execution of the work. We cannot, however, escape the conclusion, apart from all questions as to the details of the work upon the grade and the manner of doing it, that the surety company's representative used the plans and profile to but little effect, if there did not come to him at sometime during the carry-

ing out of the work a knowledge that it was not being executed according to the plans. Neither have we failed to consider the extent to which he might have been misled by the natural and the legal presumptions as to what was being required of the surety company, whether acting as a surety company or otherwise, nor the information which came to him as to the position of the railroad company and of its representatives. What we held was that, at some time during the period for which the court below allowed the reasonable value of the work, without attempting to trace the contract thereunder to the extent that under the circumstances it would be just to assume that it formed the underlying ground for the adjustment of the compensation, changes were made, which, considered as a composite, were so radical that they should not have been overlooked by the court, in view of the meager evidence offered by the surety company's representative as to the extent of his knowledge. This holding we still adhere to. The contract was not rescinded, and it was not to be disregarded to the extent that it was in the admeasurement of the damages. We might have been radically wrong in our apprehension of the details of the work, and in our calculations concerning it, and even have failed to give due consideration to militating presumptions and evidentiary circumstances, but it yet remains that there were bold facts, largely physical, not explained by the evidence or neutralized by any deduction therefrom, which forbade the conclusion, as the evidence stands, that at some time during the period allowed for, the surety company did not, practically speaking, have knowledge. Our view is that the learned judge who made the special finding was led to find as he did concerning the surety company's lack of knowledge through a failure to apply the principles of notice pointed out in the opinion, and therefore we need not now be at the pains in this opinion to review in detail the many matters concerning the evidence pointed out by appellee's counsel, which we regard as inconclusive at the best. Whether ap-

pellee can satisfy the court or jury upon another trial that the surety company's representative did not have knowledge at some stage of the work is a question we need not now consider, for we apprehend that it is scarcely possible that, in view of our conclusions as stated, an explanation can be forthcoming which will justify an allowance to the full extent made upon the prior trial.

It is immaterial whether the surety company performed the work as the assignee of McNerney or as surety pursuant to notice by the railway company, for if said surety company is to be charged with the consequences of knowledge that changes had been made—and upon the present state of the evidence we so adjudge—it certainly cannot recover any greater quantum of damages than would have been awarded to it had it been a principal.

Beyond the matters before stated, the argument of appellee's counsel for a rehearing is largely an argument of questions to which we gave careful consideration before, and nothing has been brought forward to lead us to the conclusion that a rehearing should be granted.

Petition for a rehearing overruled.