**KNAB CO., Inc., Plaintiff-Appellant,**

v.

**ST. MARY'S HOSPITAL, INC.,**
**Defendant-Appellee.**

**No. 13072.**

United States Court of Appeals
Seventh Circuit.

Feb. 3, 1961.

Rehearing Denied March 17, 1961.

James R. Mattison, Milwaukee, Wis., Frederick P. Bamberger, Bamberger, Foreman, Oswald & Hahn, Evansville, Ind., Becker, Kinnel, Doucette & Mattison, Milwaukee, Wis., for plaintiff-appellant.

William H. Biggs, St. Louis, Mo., Harry P. Dees, Evansville, Ind., Biggs, Hensley, Curtis & Biggs, St. Louis, Mo., for appellee.

Kahn, Dees, Donovan, Kahn & Shrode, Evansville, Ind., of counsel.

Before SCHNACKENBERG and CASTLE, Circuit Judges, and MERCER, District Judge.

MERCER, District Judge.

This is an appeal by the plaintiff, Knab Company, from a judgment entered for defendant upon findings of fact entered by a Special Master which were adopted by the trial court. Plaintiff, a heating, ventilating and air conditioning contractor, is a Wisconsin corporation. Defendant is a charitable corporation organized and existing under the laws of the State of Indiana. The requisite jurisdictional amount being involved, jurisdiction of the federal courts is invoked upon the diversity of citizenship of the parties.

Prior to April, 1953, defendant solicited bids for five prime contracts related to the proposed construction of a six story, five wing hospital at Evansville, Indiana. Plans submitted for bids to general contractors and to mechanical trades contractors were based upon a structural steel frame for the main hospital building. In addition to the main hospital building, the plans called for the construction of a separate boiler house for the heating plant and a tunnel leading therefrom to the main hospital building. Plaintiff was invited to bid upon a contract for installation of the heating, ventilating and air conditioning system and equipment in the new building.

Plaintiff submitted a bid to furnish all labor and materials and to perform all work for the installation of the heating, ventilating and air conditioning systems of the hospital for $779,070.00. When the bids were opened on April 15, 1953, plaintiff's bid was found to be approximately $90,000.00 below the nearest competitor in its field. On April 17, 1953, defendant notified plaintiff that the defendant intended to enter into a contract with plaintiff on the basis of its low bid.

Shortly after the bids were entered on April 15, 1953, defendant notified McCarthy Bros. Construction Company, the low bidder for the general construction work on the hospital, that the overall cost of construction of the building as reflected by the aggregate bids upon the five contracts, exceeded defendant's budget for that purpose. McCarthy suggested that it could reduce its original bid by

about $135,000.00 if the walls were constructed of reinforced concrete instead of the structural steel frame. That structural change also embraced a change of construction of all floors above the first floor from flat slab to pan slab reinforced concrete.[1] The general construction contract was drafted to embrace the suggested change in structure.

On or about May 4, 1953, plaintiff was advised by letter from McCarthy of the proposed structural change and was requested to notify defendant's architects if plaintiff believed its work would be materially affected by the change. Thereafter, on May 12, 1953, officials of plaintiff conferred with the architects and their mechanical engineer and with representatives of McCarthy with respect to the contemplated change of the structural plan. Thereafter, on May 15, 1953, the successful bidders, including McCarthy and plaintiff, met with agents of defendant at Evansville, Indiana, and signed their respective contracts.

Plaintiff completed its contract and received therefor the sum of $805,774.57, which included the stipulated $779,070.00, plus certain agreed extras.

The complaint in this cause was based upon a claim by plaintiff for additional compensation predicated upon two alternative counts and theories. First, plaintiff alleged that an oral contract was made subsequent to the written contract, which provided that plaintiff was to be compensated for its undertaking upon a cost-plus basis, i. e., cost of labor and materials, plus a percentage markup for overhead and profit. In its alternative count, plaintiff prayed the value of materials and services rendered upon the theory that the formal contract between the parties was abandoned. Under the cost-plus theory, upon the evidence adduced before the Special Master, plaintiff's claim for additional compensation is the sum of $284,115.81. The cause was referred to a Special Master. After a hearing, encompassing 28 trial days, the Master reported his findings of fact and conclusions of law to the court with a recommendation that judgment be entered for the defendant dismissing plaintiff's complaint.

By its order dated May 5, 1960, the trial court approved the report of the Special Master, adopted his findings of fact and conclusions of law as the findings and conclusions of the court and entered judgment dismissing the plaintiff's complaint. Plaintiff then prosecuted this appeal.

Plaintiff's position on appeal is crystallized into the contention that its written contract with defendant was amended upon June 8, 1953, by an oral agreement covering the changed structural plans and providing that plaintiff was to be paid for its work upon the basis of cost of material and labor, plus a percentage for overhead expenses and profit. As nearly as we can reconstruct plaintiff's argument from its brief, plaintiff contends that the hospital upon which it made its bid never came into existence at all, but that plaintiff was required by the defendant to do its mechanical construction work upon a new building which was not within the contemplation of the parties at all when plaintiff's bid was made.

■ Salient and noteworthy upon a first perusal of the record of this cause as reproduced for our review is the sheer bulk of the evidence which was introduced before the Special Master and upon

---

[1]. Reference is herein made to three types of concrete floors, or slabs, as follows:

a. Flat slab, consisting of a slab of concrete, flat on top and bottom, which is poured and cured upon a removable wooden form.

b. Pan slab, consisting of a slab of concrete, flat on top, and poured and cured on removable corrugated metal pans to form an integrated concrete joist and slab, corrugated on the under surface.

c. Cofar, consisting of a corrugated, permanent, metal deck upon which the slab of concrete is poured. The metal deck remains as a part of the floor structure.

The references "flat slab", "pan slab", and "cofar," respectively, whenever herein used denotes a floor slab produced by one of the above construction methods, or, as the context requires, the construction method itself.

which his findings of fact were based. Those findings were adopted by the trial court as its own findings of fact and we may not interfere therewith unless the findings are clearly erroneous. Fed.Rules Civ.Proc. 52(a), 28 U.S.C.A.; Troyak v. Enos, 7 Cir., 204 F.2d 536; Sullivan-Waldron Products Co. v. Indiana Limestone Co., 7 Cir., 216 F.2d 70; Connolly v. Gishwiller, 7 Cir., 162 F.2d 428, certiorari denied 332 U.S. 825, 68 S.Ct. 166, 92 L.Ed. 400. The statement of that principle largely disposes of this appeal.

The Master found, in pertinent part, that plaintiff submitted a bid based upon plans and specifications for a building to be constructed with a structural steel frame and flat slab concrete floors above the main floor; that plaintiff was advised prior to execution of the written contract of the proposed change in the building structure from structural steel to a reinforced concrete frame and from flat slab to pan slab floors, and was requested to advise the general construction contractor and defendant's architects whether the proposed change would materially affect the work upon which plaintiff's bid was based; that, thereafter, the contract was executed by plaintiff providing for the installation by it of all heating, ventilating, and air conditioning equipment and systems in a building with reinforced concrete frame and pan slab construction of floors above the first floor; that plaintiff's president and vice president conferred with George E. Quick, a partner of the defendant's architectural firm, on June 8, 1953, and represented to the architects that plaintiff would have increased costs as a result of the change from the steel-frame, flat-slab building to a reinforced concrete frame with pan slab floors; that plaintiff was then instructed by Mr. Quick to keep accurate records of its increased costs by wing and floor area of the structure for which plaintiff would be reimbursed, in addition to its contract price, plus not to exceed 15% of such increased costs for overhead and profit; that plaintiff did not keep and report a record of its actual cost increase which

resulted from the change in the structure, and plaintiff, therefore, was not entitled to any compensation in addition to the contract price until and unless it had satisfied the condition of submitting its record of increased costs by floor and wing to defendant's architects; that the evidence failed to show that plaintiff suffered a delay in the completion of its work as a result of the change in the frame of the building; that the change of the frame of the building from steel to reinforced concrete and of the floors from flat slab to pan slab constituted a major change in the materials to be used by the general construction contractor, but that that change had no demonstrated radical effect upon plaintiff's work or contract; that neither plaintiff nor defendant had, either expressly or by conduct, abandoned the express written contract, and that the evidence disclosed no circumstances which would justify excusing plaintiff from its duties or limitations which it assumed under that contract; and that all work done and all materials furnished by plaintiff in the construction of the hospital were done and furnished by plaintiff pursuant to the terms of its undertaking expressed in the written contract.

We do not consider it necessary copiously to summarize all of the evidence of record to demonstrate that we cannot say that any of those material findings of fact are clearly erroneous. The evidence amply discloses that a major part of plaintiff's work was not affected at all by the change in structural plans of the main hospital building. A very substantial part of plaintiff's undertaking involved the installation of equipment and duct work in the boiler house and the tunnel leading from the boiler house to the main hospital building. It appears that the change from structural steel to reinforced concrete frame and from flat slab to pan slab floors in the main hospital building required no change whatsoever in the mass of pipes, equipment and installations required by plaintiff's contract. Plaintiff's contract required it to install the same equipment and the same pipes at the same locations and in the

same places on each floor of the hospital building, irrespective of whether the frame of that building was structural steel or reinforced concrete and irrespective of whether the floor structure was flat slab or pan slab.

A necessary part of plaintiff's performance of its contract was the setting of metal sleeves, through which its pipes could pass, at specified locations on each concrete floor before the concrete was poured, and the affixing of inserts at proper places and intervals upon the underside of each concrete floor to support its pipe and equipment hangers. A number of witnesses testified that the only effect of the change of structural plans upon plaintiff's contract was the difference in labor and material which might be required to set sleeves and inserts in pan slab, as opposed to flat slab, construction. From their testimony, the Master could find that any difference in sleeve and insert labor and material costs occasioned by the change from flat slab to pan slab floors was nominal. Certainly that evidence amply supports the finding that the structural change in the building plans had no radical effect upon plaintiff's performance of its work under the contract.

The scope and nature of the conversation on June 8, 1953, between plaintiff's officers and defendant's architects is conflicting. Mr. Quick testified that that conference was held to discuss a claim made by plaintiff by letter for $47,-500.00 additional cost which plaintiff asserted would arise because of the change of plans. He testified that the plaintiff's officers then asserted that the change in plans would entail additional costs to plaintiff in the setting of its sleeves and inserts, and that after some discussion of that subject, he advised plaintiff to set the sleeves and inserts and keep an accurate record of any extra costs thereby incurred, and to submit its records of costs to the architects after the concrete was poured. Correspondence between plaintiff and the architects, which is in evidence, indicates that the report of costs was to be submitted separately for each floor and wing, and that the increased cost to plaintiff was to be compensated on a cost-plus basis. Mr. Quick testified that he made that arrangement with plaintiff pursuant to the general conditions of the contract.

Paragraph 45 of the general conditions of plaintiff's contract relating to changes in work, which is set forth in full in the findings of the Master, provided, inter alia, for the determination of extra charges for changes in work by requiring the contractor to proceed with the work and to keep and present to the owner a correct account of the costs of the change, together with all vouchers therefor. That paragraph then provided that the cost of such change in work might include an allowance for overhead and profit not to exceed 15% of the net cost of the construction. Upon that evidence the Master found that the conversation of June 8 related to the means for fixing plaintiff's compensation for the setting of sleeves and inserts as a departure from the regular contract provisions, provided that plaintiff should furnish to defendant's architects accurate records by wing and floor of its extra costs. Plaintiff's vice-president testified that the only claims ever submitted to the architects related to such additional cost were based upon an estimate prepared prior to commencement of any construction of the building, not upon costs records of the actual construction. Certainly the Master could find and conclude, as he did, that the submission of actual cost records by floor and wing was a requisite condition to plaintiff's right to demand additional compensation for increased costs occasioned by the structural change, and that no such cost records were ever submitted by plaintiff to defendant or its architects.

Suffice it to state that, upon our review of the record before us, we cannot say that any material finding is clearly erroneous.

A contention asserted with force before the Master, and with somewhat less vigor here, is plaintiff's argument that the original contract specifications called

for cofar floors above the main floor of the hospital building. The Master concluded, construing the original specifications attached to plaintiff's invitation to bid, that the original plans specified flat slab floors, with cofar as an alternate possibility. The Master further concluded that the effect of the mention of the cofar alternate was to put plaintiff on notice that its bid should be based upon a consideration of the possibility that cofar might have been used instead of flat slab. The Master found that plaintiff had construed the specification as specifying flat slab until a time after the contract was completed. That finding is supported by a number of statements by plaintiff's officers in correspondence and conversations with agents of defendant in which the claim was asserted that the increase in cost claimed by plaintiff arose from the change of the floors from flat slab to pan slab. The latest letter in the series to which the Master refers was dated June 6, 1955, and signed by the vice-president of plaintiff, in which the contention was made that plaintiff had bid the job on the basis of flat slab, and that one of the primary reasons for increased cost was the extra expense occasioned by the necessity of setting sleeves and inserts in pan construction rather than flat slab. The Master was certainly justified in finding that both parties had construed the original specifications as calling for flat slab construction, and that the cofar theory was an afterthought on plaintiff's part.

Inasmuch as the findings of fact of the Master, as adopted by the trial court, are unassailable on this record, plaintiff's rights are to be determined under the terms of the written contract. Plaintiff undertook thereby to do a stated volume of construction work for a stated price, and it must find its rights to compensation within the four corners of that document unless the agreement was otherwise modified by the parties, either expressly or by their conduct. The Master found and concluded that there was no modification of plaintiff's contract, with the exception noted arising out of the June 8, 1953 conference between plaintiff's officers and Mr. Quick.

■ Plaintiff's position based upon the theory that the written contract was abandoned by the structural change and that it is entitled to compensation for labor and materials on a *quantum meruit* is equally untenable under established Indiana law. Cleveland, C. C. & St. L. Ry. Co. v. Moore, 170 Ind. 328, 82 N.E. 52, 84 N.E. 540, and cases there cited; Rebekah Assembly I. O. O. F. v. Pulse, 47 Ind.App. 466, 92 N.E. 1045, 94 N.E. 779.

The latter case arose upon a complaint by Pulse claiming compensation for construction work done for the Lodge. Pulse entered into a contract with the Lodge for the construction of a new building on premises of the latter and a covered passageway connecting the new building with an old building located on the same premises. The complaint alleges that the contract was negotiated upon the basis of plans and drawings, which indicated a passageway of some 90 feet in length, and Pulse agreed to construct the building and passageway for a stipulated price based upon those plans; that the contract contained a further provision that the precise site for the new building would be selected by the building committee of the Lodge; and that the site selected by the building committee required the construction of a passageway 203 feet in length. Pulse completed the building project, including the 203 foot passageway, and received the compensation provided by the written contract for the construction. Thereafter he filed a suit for the cost of building the additional length of passageway, upon the theory that the lengthening of the passageway was such a radical departure from the original plans that his right to compensation for construction thereof should be determined without regard to the contract terms. The trial court overruled the Lodge's demurrer to the complaint, and the case went to the appellate court to review that ruling. In reversing the decision of the trial court, and holding

that defendant's demurrer should have been allowed, the court said, in pertinent part, at page 1046 of 92 N.E.:

"If it were true that the appellant so radically changed the plans of the work contracted to be done as that the terms of the written contract did not apply to it, then the appellees were under no obligation to proceed with the work at all, and if they did proceed with it, without objection or question, leaving their employer to understand that they were proceeding in the work under the contract, they cannot after the work is done assert that the contract shall not determine their rights. If appellees thought they were entitled to extra compensation for constructing the passageway on account of the fact, as they claim, that the building committee located the new building further away from the old one than contemplated by the original plans, upon which they made their bid, it was their duty to have raised the question before doing the work, and had it settled as provided such disputes should be settled by their contract, and had the compensation fixed by agreement beforehand, and made a matter of writing."

Again at page 1047 the court said, in pertinent part:

"If parties enter into a special contract regarding any subject-matter, and afterwards by agreement change and modify the subject of the contract that it cannot be identified by the contract, the special contract could not be held to apply to such changed subject, as it was very properly held in the case of Norton v. Browne, 89 Ind. 333, to which we are referred, but this is not the case here. Here the principal subject-matter of the contract in question was the construction of a new building upon appellant's ground. The erection of the passageway between the new and the old buildings was but an incident in the major subject, and it was clearly in the contemplation of the parties that this passageway should be constructed wherever the new building might be located by the parties, * * *."

The court then concluded that Pulse was entitled to no compensation over and above that expressly provided by the terms of the contract.

In Cleveland, C., C. & St. L. Ry. Co. v. Moore, 170 Ind. 328, 82 N.E. 52, 84 N.E. 540, the Indiana Supreme Court rejected the theory that a contractor, operating under a special contract, could recover on a theory of *quantum meruit* for work done in addition to that undertaken in the contract. The railroad let a contract to one McNerney for the grading and laying of a railroad yard and several miles of main track in accordance with plans and specifications attached to the contract. McNerney was to receive 15¢ a yard of earth for the grading, and 12¢ a foot for track laying. Each of those figures was roughly fifty per cent of the reasonable value of the work undertaken. McNerney began work on the yard under the contract, and continued working for a time after the railroad had made radical changes in the grade. He later abandoned the contract, and the railroad called upon McNerney's surety company to complete the project. The surety thereupon undertook the prosecution of the remaining work and continued for about 8 months before it too abandoned the contract. Extensive changes were made from time to time by engineers of the railroad in the work to be done in the yard. The court found that the size of the yard was more than doubled, that the grade was drastically changed, and that a contract provision providing for a bridge overpass over a highway was changed to require the excavation of a subway underpass. Notwithstanding these changes, the surety continued with the work until it too decided the contract should be abandoned. It then filed suit upon a theory of *quantum meruit*, for the reasonable value of the work done by it over and above the number of yards of earth estimated in

the contract to be necessary to complete the grade for the yard and the main-line in accordance with the original plans. The trial court determined that the surety could recover on its theory at a rate of 30¢ per yard for such excess yardage. That judgment was based in part upon the court's finding that the surety company was without knowledge that the original plans had been changed. That finding was reversed and the cause was remanded for a new trial. The court held that, upon the evidence, knowledge of a part of the changes in the original plans would be imputed to the surety, and that that knowledge coupled with acquiescence on its part, and reliance on such conduct by the railway company, brought the claim for extras within the provisions of the written contract in fixing the quantum of recovery.

It is noteworthy that the court, in its decision, assumed that the changes made in the construction plan attached to the original contract were of such a radical nature as to amount to an abrogation, or breach, of the contract by the railroad. As a part of the lengthy review of case law in the field, the court said that the fact that the contract had been violated by the railroad did not authorize the surety to recover under a *quantum meruit* for work comprehended by the special contract at a price in excess of that fixed by the contract for such work.

The surety contended that all of the work should be treated as if no written contract existed. The court rejected that contention, saying that the fact that the first radical change, *i. e.*, of the grade of the yard, antedated the surety's endeavor to perform the contract, could not be construed as an unqualified refusal of the railway company to perform the contract according to its original terms and could not raise an assumption that the parties, thereafter, were proceeding under an implied contract. The court would not assume that a breach of contract by one party, *ipso facto*, voided the contract. The breach was held to create a condition which renders the contract voidable at the election of the other contracting party, not void. Finally, the court held that the surety was chargeable with knowledge of some of the changes in plans, and that, upon receipt of that knowledge, it was incumbent upon the surety to abandon the contract and so notify the railroad if it wished to avoid the same. Having continued with the work with knowledge of the change of plans and having allowed the railroad to assume that it was incurring no expense other than that provided under the contract, compensation for such extra work was governed by the contract terms. To the same effect are Lichter v. William R. Goss Co., 7 Cir., 232 F.2d 715; Frailey v. McGarry, 116 Utah 504, 211 P.2d 840; Snowball v. Maney Bros. & Co., 1928, 39 Wyo. 84, 270 P. 167, 271 P. 875, 61 A.L.R. 199; McNulty v. Keyser Office Bldg. Co., 112 Md. 638, 76 A. 1113.

We think the cited cases control in the case at bar. Plaintiff contracted to install a given amount of pipes, equipment and fixtures in defendant's hospital building. Despite the change in structural plans of the building, plaintiff still installed the same amounts of pipe, equipment and fixtures in the changed structure. Having continued with the contract to completion, plaintiff is bound by the stipulated contract price for the work unless additional costs directly resulting from the change of structural plans are shown. The trial court found that no such extra costs were shown, and that the excess of plaintiff's expenditures over contract price for the work were as readily attributable upon the evidence to underbidding as to any other cause.

Plaintiff relies upon Wunderlich Contracting Co. v. United States, 10 Cir., 240 F.2d 201, and Continental Casualty Co. v. Schaefer, 9 Cir., 173 F.2d 5, as authority supporting its right of recovery. We do not so construe those cases. In each, the trial court had found that the written contract had been abandoned by the parties and that the work had been completed under an implied contract. The first and an obvious ground for distinc-

tion of those cases from the case at bar is the fact that the trial court, in each, found the facts in favor of the contractor upon conflicting evidence. The second and equally obvious distinction is found in the fact that the contractor in both the Wunderlich and Continental cases was required to do work completely outside the contemplation of the written contract.

We have considered all other arguments and theories advanced by plaintiff and find that all are without merit. The judgment is therefore, affirmed.